**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANDREW J. DAWES,                     )
                                     )
              Plaintiff,             )
                                     )          Civil Action No. 11-552
       v.                            )
                                     )          **ELECTRONICALLY FILED**
COMMISSIONER OF SOCIAL               )
SECURITY ADMINISTRATION,             )
                                     )
              Defendant.             )

## MEMORANDUM OPINION

**I.     INTRODUCTION**

Andrew J. Dawes ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying his application for disability insurance benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").  This matter comes before the Court

on Cross Motions for Summary Judgment. (ECF Nos. 8, 10).  The record has been developed at

the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment

(ECF No. 8) will be DENIED, and Defendant's Motion for Summary Judgment (ECF No. 10)

will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration on July 17, 2007, claiming an inability to work due to disability beginning August 31, 2006. (R. at 102 – 107)[1]. Plaintiff was initially denied benefits on September 18, 2007. (R. at 66 – 69). A hearing was scheduled for October 6, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 6 – 39). A vocational expert also testified. (R. at 22). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on March 23, 2009. (R. at 42 – 57). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which was denied on March 22, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 4).

Plaintiff filed his Complaint in this Court on April 29, 2011. (ECF No. 2). Defendant filed his Answer on June 30, 2011. (ECF No. 5). Cross Motions for Summary Judgment followed.

## III. STATEMENT OF THE CASE

In his decision denying DIB to Plaintiff, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006;

2. The claimant has not engaged in substantial gainful activity since August 31, 2006, the alleged onset date;

---

[1] Citations to ECF Nos. 6 – 6-12, the Record, *hereinafter*, "R. at __."

3. The claimant has the following severe impairments: Insulin dependent diabetes mellitus, episodic period of hypoglycemia secondary to substance abuse, major depression, bipolar disorder, and substance use disorders (alcoholism and drug use);

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

5. After careful consideration of the entire record, I find that, based on all of the impairments, including the substance use disorders, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except he: must avoid unprotected heights and moving machinery; is limited to simple, routine, repetitive work not performed in a fast pace production environment, with relatively few work-place changes and relatively low stress; and he would be limited to performing work-related activities no more than 30 minutes at a time, 1 to 3 times a week, at unpredictable times;

6. The claimant is unable to perform any past relevant work;

7. The claimant was born on February 21, 1966 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date;

8. The claimant has at least a high school education and is able to communicate in English;

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above;

10. Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorders, there

are no jobs that exist in significant numbers in the national economy that the claimant
can perform;

11. If the claimant stopped the substance use, the remaining limitations would cause more
than a minimal impact on the claimant's ability to perform basic work activities;
therefore, the claimant would continue to have a severe impairment or combination of
impairments;

12. If the claimant stopped the substance use, the claimant would not have an impairment
or combination of impairments that meets or medically equals any of the impairments
listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

13. If the claimant stopped the substance use, the claimant would have the residual
functional capacity to perform light work as defined in 20 C.F.R. § 404. 1567(b)
except he: would be required to avoid unprotected heights and moving machinery;
and would be limited to simple, routine, repetitive work not performed in a fast pace
production environment, with relatively few work-place changes and relatively low
stress;

14. If the claimant stopped the substance use, the claimant would continue to be unable to
perform past relevant work;

15. Transferability of job skills is not material to the determination of disability because
using the Medical-Vocational Rules as a framework supports a finding that the
claimant is "not disabled," whether or not the claimant had transferable job skills;

16. If the claimant stopped the substance use, considering the claimant's age, education,
work experience, and residual functional capacity, there would be a significant
number of jobs in the national economy that the claimant could perform; and,

17. Because the claimant would not be disabled if he stopped the substance use, the claimant's substance use disorder is a contributing factor material to the determination of disability. Thus, the claimant had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(R. at 45 – 57).

## IV. STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schandeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). A United States District Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191(3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule-making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly

limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'r v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.    DISCUSSION

Presently, Plaintiff objects to the determination by the ALJ that Plaintiff's drug and alcohol abuse ("DAA") was a contributing factor material to his inability to work, and therefore

precluded eligibility for DIB. (ECF No. 9). Plaintiff argues that the ALJ failed to properly account for medical evidence weighing in Plaintiff's favor, and dismissed Plaintiff's personal statements without adequate justification. (ECF No. 9 at 4, 11).

With respect to DAA, the Act states that "an individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Ambrosini v. Astrue*, 727 F. Supp. 2d 414, 428 (W.D. Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the 'key factor' in making the above conclusion is determining whether a claimant would continue to be disabled if he or she ceased to use drugs and/or alcohol. *See also Nomes v. Astrue*, 155 Soc. Sec. Rep. Serv. 860, 2010 WL 3155507 at * 7 – 8 (W.D. Pa. 2010) (quoting *Warren v. Barnhart*, 2005 WL 1491012 at *10 (E.D. Pa. 2005)). This determination "must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." *Ambrosini*, 727 F. Supp. 2d at 430 (citing *Sklenar v. Barnhart*, 195 F. Supp. 2d 696, 699 – 706 (W.D. Pa. 2002)). Side effects of DAA, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed. EM-96200 at q. 25 – 28. It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work, and if it is not possible to distinguish between the limitations created by DAA or the claimant's other impairments, to find that DAA is not a contributing factor material to disability. *Id.*

The earliest records show that Plaintiff was admitted to the emergency department at UPMC Horizon Hospital on November 14, 2006. (R. at 144). Hospital records indicated that Plaintiff was found unresponsive by his girlfriend and that he had been drinking heavily. (R. at

144, 148 – 49, 156).  Hospital staff noted that Plaintiff's hypoglycemia was responsible for his admission.  (R. at 157).  His condition improved at the hospital.  (R. at 156).  Upon release, the treating physician advised Plaintiff that he needed to control his medications and that he should have "No Alcohol!!"  (R. at 147, 158).

Following his hospital stay, Plaintiff received an Adult Psychosocial Assessment by Harshad Patel, M.D. at Primary Health Network.  (R. at 160 – 62).  Dr. Patel observed that Plaintiff was depressed – though Plaintiff denied feeling depressed – and noted that Plaintiff reported difficulty holding a job due to passing out at work and failing to get to work on-time.  (R. at 160 – 62).  Dr. Patel reported that Plaintiff had a history of daily alcohol use, and that Plaintiff self-medicated with alcohol and pain medications.  (R. at 160 – 62).

Dr. Patel observed that Plaintiff was alert and oriented, that he had fair concentration, poor insight and judgment, and fair motivation.  (R. at 160 – 62).  He diagnosed Plaintiff with bipolar disorder, and gave Plaintiff a global assessment of functioning[2] ("GAF") score of 55.  (R. at 160 – 62).  Plaintiff's highest GAF score over the past year was 65, and his lowest was 55.  (R. at 160 – 62).  Plaintiff's barriers to employment were his "lack of support," and "daily drinking." (R. at 160 – 62).

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

The first indication in the medical record that Plaintiff was receiving regular treatment for his diabetes and mental conditions was in November of 2006 when he was first seen by Lori Leipheimer, CRNP, and Iftikhar Chatha, M.D. (178 – 79). Plaintiff explained that he had difficulty sensing his blood sugar level, which often led him to use too much insulin – reducing his blood sugar levels drastically. (R. at 178 – 79). He claimed that over the previous several years he only sporadically sought treatment because he was without insurance. (R. at 178 – 79). He claimed that his mental condition and fluctuating blood sugar levels prevented him from holding employment. (R. at 178 – 79). Plaintiff reported living with his girlfriend, and drinking beer, smoking, and drinking caffeine every day. (R. at 178 – 79). It was discussed with Plaintiff that he should quit smoking and drinking alcohol. (R. at 178 – 79). Dr. Chatha noted that Plaintiff needed to change his insulin dosages. (R. at 178 – 79). Plaintiff also needed to see an endocrinologist to maintain his poorly controlled diabetes. (R. at 178 – 79).

At a follow-up visit in February of 2007, Ms. Leipheimer noted that Plaintiff had not changed his insulin regimen as ordered by Dr. Chatha. (R. at 176). Plaintiff was noted to be noncompliant with diabetes management. (R. at 176). He failed to attend a scheduled appointment with an endocrinologist. (R. at 176). His uncontrolled diabetes was considered to be related to his alcoholism and his failure to eat regularly, and it was stated that he would not be able to control his diabetes until he was free of drug and alcohol addictions. (R. at 176). Ms. Leipheimer noted that Plaintiff had a long history of depression and bipolar disorder. (R. at 176). He was supposed to attend drug rehab shortly after his appointment. (R. at 176).

Plaintiff was admitted to the Meadville Medical Center Grove Street Drug and Alcohol facility for substance abuse on February 11, 2007. (R. at 163 – 67). He remained until March 4. (R. at 163 – 67). Plaintiff was diagnosed with substance abuse, alcoholism, opioid dependency,

and type I diabetes. (R. at 163 – 67). The only record of Plaintiff's past difficulties was his own historical account. (R. at 163 – 67). He claimed to be depressed and bipolar. (R. at 163 – 67). During his stay at the Grove Street facility, Plaintiff was taken by ambulance to the emergency room at the Meadville Medical Center for side effects related to low blood sugar levels. (R. at 163 – 67). His blood sugar levels returned to normal the same day. (R. at 163 – 67). Hospital staff indicated that he had become hypoglycemic as a result of an increased insulin dose. (R. at 163 – 67).

At a follow-up in March of 2007, Plaintiff continued to complain of hypoglycemic episodes, and his insulin regimen was adjusted. (R. at 174). He had still not yet been seen by an endocrinologist and was reminded to make an appointment. (R. at 174). In April of 2007, Plaintiff reported to Ms. Leipheimer that he was switching psychiatrists, and that he had still not seen an endocrinologist. (R. at 173). Plaintiff claimed to be drug and alcohol free at the time. (R. at 173). He was again reminded to see an endocrinologist and was warned about the side effects of his failure to properly treat his vacillating blood sugar levels. (R. at 173).

In May of 2007, Plaintiff was again seen by Ms. Leipheimer. (R. at 171 – 72). Plaintiff's blood sugar was still uncontrolled, he was drinking occasionally, and had still not seen by an endocrinologist. (R. at 171 – 72). She indicated that Plaintiff was severely noncompliant with his diabetes management and informed him that if his conduct persisted, she would not continue to treat him. (R. at 171 – 72). The following month, the same issues were noted, and Plaintiff had failed to follow through with a battery of tests Ms. Leipheimer had ordered. (R. at 170).

Plaintiff saw Theresa Marx-Armile, M.D. in April of 2007. (R. at 260 – 61). Plaintiff was found to have uncontrolled diabetes, that he did not keep to a schedule for administering insulin, and that he needed to decrease his dosages. (R. at 260 – 61). Plaintiff also needed to

monitor his eating habits.  (R. at 260 – 61).  If he managed his diabetes and avoided

hypoglycemic episodes, his blood sugar awareness would improve.  (R. at 260 – 61).  He was

noted to complain of depression.  (R. at 260 – 61).

In July of 2007, Plaintiff underwent a Biopscyhosocial and Diagnostic Assessment with

Jose Santiago, M.D. and Leslie Stock, LCSW.  (R. at 303 – 04).  He was referred for the

assessment because of depression and passive suicidal ideation.  (R. at 303 – 04).  Plaintiff was

noted to have diabetes, that he did not monitor his blood sugar well, and that he ate irregularly.

(R. at 303 – 04).  He also was noted to drink heavily every day.  (R. at 303 – 04).  His alcohol

use negatively impacted his health.  (R. at 303 – 04).

This July assessment was similar to an earlier May 15, 2007 assessment, wherein it was

noted that Plaintiff drank fifteen to twenty shots of alcohol every day, and had a history of

depression severely affected by his chronic alcohol use, substance abuse, and lack of motivation

to abstain from alcohol, food, and other drinks that caused him to have medical and mood

problems.  (R. at 293 – 302).  Plaintiff was noted to be noncompliant with treatment

recommendations.  (R. at 293 – 302).  He was diagnosed with depression and polysubstance

abuse.  (R. at 293 – 302).  His weakness was indicated to be his chronic drinking.  (R. at 293 –

302).  He was given a GAF score of 50 – 55.  (R. at 293 – 302).

Plaintiff received counseling and psychiatric medication from Sharon Regional

Behavioral Health Services beginning in June of 2007 and ending in March of 2008.  (R. at 283 –

88).  Plaintiff generally drank every day, was depressed, and suffered passive suicidal ideation.

(R. at 283 – 88).  He attended Alcoholics Anonymous, but to little effect.  (R. at 283 – 88).  A

Behavioral Health Assessment in June of 2007 described Plaintiff as suffering from bipolar

disorder and depression.  (R. at 289 – 92).  He claimed that he self-medicated with alcohol and

opiates. (R. at 289 – 92). His substance abuse increased over time, and was excessive at the time of his assessment. (R. at 289 – 92). He was given a GAF score of 59. (R. at 289 – 92).

In making his determination to deny benefits to Plaintiff, the ALJ discussed Plaintiff's above history at length. (R. at 48 – 55). It is quite clear, based upon this record, that because Plaintiff failed to abstain from alcohol, he could not control his diabetes. (R. at 176). Multiple treating sources during and immediately following Plaintiff's alleged disability onset date noted the severity of the effects Plaintiff's alcohol abuse had upon his diabetes. This was an apparent extension of his larger – frequently observed – noncompliance with diabetes treatment. In his decision, the ALJ isolated the diabetes-related complications associated with Plaintiff's concurrent alcohol abuse over the length of the record, and determined Plaintiff's degree of functional limitation with and without his alcohol use. The ALJ's ultimate decision was supported by substantial evidence, and comported with the requirements for finding DAA material to a claimant's disability.

Incidentally, Plaintiff provided the ALJ with a large number of medical records from 2008, none of which related back to Plaintiff's degree of limitation/ disability prior to December 31, 2006. (R. at 306 – 419). There is, however, a continuing indication of a lack of compliance with diabetes management and alcohol use into 2008. (R. at 306 – 419). Nevertheless, inasmuch as these records did not indicate Plaintiff's degree of functioning during the relevant period on or prior to December 31, 2006, they are not entitled to significant weight. Plaintiff's date last insured for purposes of DIB was December 31, 2006, and he claimed disability as of August 31, 2006. (R. at 49; ECF No. 9 at 1; ECF No. 11 at 2). In order to qualify for DIB, Plaintiff must be able to show that he was disabled on or before December 31, 2006. *Abrams v. Comm'r of Soc.*

*Sec.*, 2010 WL 3906246 at *1 (W.D. Pa. Sept. 29, 2010) (citing 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131).

Plaintiff failed in sustaining this burden of proof. As pointed out by the ALJ, there is an obvious dearth of objective medical evidence relating back to the relevant period during which Plaintiff must show that he was disabled. (R. at 48 – 55). State agency consultant Edward Jonas, Ph.D. could not even complete a Psychiatric Review Technique on December 31, 2006, because after contacting Plaintiff's treating sources, there was "insufficient evidence to assess his disability." (R. at 185 – 97). As indicated by the ALJ, reports of Plaintiff's functional capacity and eligibility for DIB, based upon the impairment listings at 20 C.F.R., Pt. 404, Subpt. P, App'x 1, were made between one and two years following Plaintiff's date last insured, and were not supported by longitudinal evidence illustrating that Plaintiff was disabled from work during the relevant period. As a result, these reports do not speak to Plaintiff's degree of limitation on or before December 31, 2006, and were, therefore, entitled to no more consideration than was provided by the ALJ. Consequently, in addition to the materiality of Plaintiff's DAA to his inability to work, Plaintiff's failure to adduce definitive evidence indicating disability on or before his date last insured precludes eligibility for DIB.

## VI. CONCLUSION

Based upon the foregoing, the Court finds that the ALJ put forth sufficient evidence from the record to justify his decision Plaintiff was not eligible for DIB. Substantial evidence supported the ALJ's findings.

Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the decision of the ALJ will affirmed. An appropriate Order follows.

*/s Arthur J. Schwab*
Arthur J. Schwab
United States District Judge

cc/ecf: All counsel of record.